Filed 6/20/16  In re Rn. M. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Rn. M. et al., Persons Coming Under the Juvenile Court Law. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ROMEO M., Defendant and Appellant. | B267663 (Los Angeles County Super. Ct. No. DK11268) |

APPEAL from order of the Superior Court of Los Angeles County, Annabelle Cortez, Judge.  Reversed in part, affirmed in part.

Mitchell Keiter, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel and R. Keith Davis and Kim Nemoy, Deputy County Counsel, for Plaintiff and Respondent.

Appellant Romeo M. (Father) and M.M. (Mother) are the parents of a 14-year-old boy, "Rn," and an 11-year-old girl, "Ri." Jurisdiction was asserted over the children based on incidents in which Mother's male companion: (1) threatened Father with a loaded handgun and pushed and struck Rn when he tried to intervene; and (2) pushed Rn and threw a pill bottle at him. Mother was found to have failed to protect the children. There were no charging allegations against Father, whom the court specifically found to be "non-offending" when it released the children to him at the detention hearing. Father appeals the juvenile court's dispositional order, which required him, among other things, to participate in a high-conflict parenting program and individual counseling. We conclude that neither the jurisdictional findings nor the evidence as a whole supports the conclusion that Father's participation in a parenting program or individual counseling is necessary to protect the children or eliminate the conditions that led to the assertion of jurisdiction. Accordingly, we reverse the court's dispositional order in part.

## FACTUAL AND PROCEDURAL BACKGROUND

Father and Mother separated in May 2012. They were given joint legal custody of the children. Mother had physical custody; Father had the children every other weekend and on Wednesday evenings. Mother entered into a new relationship with Richard F.[1] Richard is a veteran, suffering from depression, PTSD, and multiple physical disabilities.

---

[1] Mother and Richard are the parents of two-year-old S.F., who was one of the subjects of the proceedings below. Neither Mother nor Richard are parties to this appeal. S.F. is not a subject of this appeal. References to "the children" herein are to Rn and Ri.

2

On April 17, 2015, Father arrived late at the house Mother and Richard shared to pick up the children for a regular weekend visit.[2]  As Ri was getting into Father's car, Richard came out of the house, calling Father names and swearing. Ri started crying.  Richard pulled out a handgun, pointed it at Father, and activated its laser sight.  Father saw him cock the gun.  Rn stepped in between Father and the gun, and began struggling with Richard for control of the weapon.  Richard knocked the boy down and kneed him in the head before again training the weapon on Father.  Richard finally backed down when Mother came out of the house and begged him to stop.  Father and the children left, and police officers arrived to arrest Richard.  When interviewed by authorities, Richard claimed he had the gun for protection against Father, and that it was unloaded; however, when police officers located the gun, hidden inside the house, it was loaded.[3]

Interviewed by the Department of Children and Family Services (DCFS) caseworker, Ri described herself as "very afraid" and "hysterical[]" when she saw Richard with the gun.  Both children reported that Richard regularly called them "dumb" and "stupid."  Ri said Mother and Richard made her feel like "'a big waste of time'" and that she wrote of her experiences in the home in her "'diary of sadness.'"  The children also reported that a few months earlier, Richard swore at Rn, pushed him, and threw a medication container that missed Rn and hit Mother. With respect to where they wanted to live, Rn reported being afraid for his life if returned to Mother's home while Richard was living there.   Ri, too, said she

---

[2]    According to Mother, Father had a pattern of arriving late for scheduled pickups. He had texted Mother that day to let her know he was running late and she did not raise any issues with him.

[3]    No other guns were found inside the house, but Richard admitted having other guns in storage.

would not feel safe returning to Mother's home while Richard was there.[4]  Both

felt safe with Father, and denied any form of abuse on his part.[5]  The children were

already in monthly therapy, and Father promised to ensure that the children

continued to participate due to the trauma they received from Richard's actions.

Father told the caseworker he was concerned with the well-being of the children if

they were returned to Mother's care because she did not seem to appreciate the

dangerous nature of Richard's behavior.

Father and Mother reported a 2012 incident of domestic violence.  Mother

said Father became enraged and threatened to kill her with a knife after she

confronted him about an affair.  Father claimed he had threatened destruction of

Mother's property, not her person.  Father was arrested and charged, but the

charges were dismissed after he completed a 52-week domestic violence program

ordered by the criminal court.[6]

At the May 2015 detention hearing, the court vested placement and custody

of the children with DCFS, and released them to Father.  In so doing, the court

---

[4]      Richard moved out of Mother's home in June 2015.  However, Mother continued
her relationship with him, which caused the caseworker to be concerned because Richard
was not cooperating with DCFS to resolve his mental health issues, and because Mother
appeared to be in denial about the trauma he had inflicted on the children.  Mother
expressed the belief that the children had an unfavorable opinion of Richard due to
Father's influence, rather than acknowledging the effect Richard's own behavior had on
them.

[5]      Both Father and Mother were employed.  There was no evidence of mental illness
or substance abuse on either parent's part.

[6]      DCFS received two prior referrals, in 2013 and 2014, both alleging Mother left the
children home alone when she went to work.  The allegations were deemed unfounded.
In investigating these referrals, DCFS learned of the domestic violence incident and
conducted an investigation, but found no conclusive evidence to support jurisdiction.

4

stated: "Findings are made as to the Mother and [Richard] only. [Father] is non-offending."[7]

In the report prepared in advance of the August 2015 jurisdictional hearing, DCFS reported that the children continued to participate in therapy once a month. The report stated that an assessor from the Department of Mental Health had recommended more frequent sessions in May 2015, but that Father had yet to act on the recommendation. Father allegedly also had ignored a recommendation from Ri's teacher that the girl receive tutoring. The caseworker perceived Ri to be angry, struggling socially and academically, and to be suffering from low self esteem. The report claimed Father and Mother had ongoing conflicts, but described only disputes that had occurred between 2007 and 2012, prior to their separation. The report stated there was substantial danger to the children from Mother's and Richard's behavior; it said nothing about any potential danger from Father. The report further stated: "Although parents stated that they get along and are civil with each other, it does not appear that they have the children's best interest at heart. [Mother] is quick to put blame on [Father] for the children not approving of [Richard]. However, [Mother] fails to acknowledge that [Richard's] behavior towards the children affects the children's emotional health. DCFS records indicate that the parents have been playing the blame game for several years. . . . . Without[] the Court's continue[d] jurisdiction [i]n the matter, it does not appear that the parents will ensure that the children['s] emotional needs are address[ed] in a therapeutic setting. Further, the parents are in need of developing skills that would allow them to co-parent the children." Accordingly, DCFS recommended that Father participate in a family maintenance plan to include a

---

[7]    Father asked for and received a temporary restraining order to keep Richard away from him and the children.

program addressing "high conflict" parenting, individual counseling to address "domestic violence and case issues," and family/conjoint counseling when deemed appropriate.

At the August 27, 2015 jurisdictional hearing, observing that Father "[was] not named" in the petition, the court found that Richard placed the children in "a detrimental and endangering situation" by "brandish[ing] a loaded firearm and point[ing] [it] at the children . . . and [Father]," and by physically abusing Rn, kneeing him in the head, pushing him and throwing a pill bottle at him. The court further found the Mother knew of the physical abuse and failed to protect Rn.[8]

When the court turned to disposition, Father's counsel asked the court to terminate jurisdiction, leaving physical custody of the children with him. The children's attorney objected to termination, stating the children needed services to deal with both the situation alleged in the petition and their parents' divorce. She expressed concern that if the case were to be closed, they would no longer have access to services "to help them deal with these issues, which . . . have been very traumatizing for them." She asked that the case remain open "to ensure that the children are enrolled . . . in therapy," to address "the things that have occurred in this case, that have occurred between their [parents] and the family dynamics . . . ." She also asked that Father be instructed to enroll Ri in tutoring.

DCFS's attorney asserted the agency's position that Father and Mother should participate in high-conflict parenting because "[t]he issues regarding what happened with the weapon stem from the family law fighting amongst the . . .

---

[8]      Jurisdiction was asserted under Welfare and Institutions Code section 300, subdivision (b) (failure to protect) and subdivision (j) (abuse of sibling). Undesignated statutory references are to the Welfare and Institutions Code.

parents . . . ."[9]  However, a moment later, arguing in favor of granting Father a permanent restraining order, counsel stated:  "[Father] did nothing to instigate what happened."[10]

The court found "a need to maintain jurisdiction . . . [to] make sure that [the children are] receiving appropriate services" and to assist in obtaining a "different family dynamic[] . . . ."  The court ordered Father to participate in individual counseling to address case issues, conjoint counseling with the children, and a high-conflict parenting class.  The court also ordered that the children participate in counseling with a DCFS-approved therapist.  Father noticed an appeal.

## DISCUSSION

"At the dispositional hearing, the [dependency] court must order child welfare services for the minor and the minor's parents to facilitate reunification of the family.  [Citations.]" (*In re Christopher H*. (1996) 50 Cal.App.4th 1001, 1006.)  Section 362, subdivision (a) provides that once a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, "the court may make any and all reasonable orders for the care,

---

[9]    Counsel for DCFS submitted a transcript of proceedings in family court to "provide the Court some insight as to the acrimony between the parents" and demonstrate that "Mother and [Father] are going to have to learn how to coparent safely and effectively."  In the transcript, Mother expressed doubt about Father's excuses for failing to take the children for scheduled visitation on two occasions.  Father explained that he missed two visits within a year due to car trouble and medical problems.  Mother asked the court for funds for childcare because Father had said he did not want Richard taking care of the children when she went to work.  The court offered Father the option of paying for childcare, but Father instead consented to Richard caring for the children the three evenings Mother worked.  Nothing in the transcript supports the existence of any unusual acrimony between Father and Mother.

[10]    At the hearing, the court issued a permanent restraining order, protecting Father and the children from Richard.

7

supervision, custody, conduct maintenance, and support of the child . . . ."  Section 362, subdivision (d) provides:  "The juvenile court may direct any reasonable orders to the parents or guardians of the child who is the subject of any proceedings under this chapter as the court deems necessary and proper to carry out this section . . . .  That order may include a direction to participate in a counseling or education program, including, but not limited to, a parent education and parenting program . . . .  The program in which parent or guardian is required to participate shall be designed to eliminate those conditions that led to the court's finding that the child is a person described by Section 300."  (See also § 361.2 [when considering granting custody to parent with whom child was not residing at time of detention, court may "[o]rder that the parent assume custody subject to the supervision of the juvenile court," and "may order that services be provided . . . to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision" (*Id.*, (b)(2)(3))].)  As many courts have held, these provisions permit the juvenile court to issue dispositional orders that affect a non-offending parent.  (See, e.g., *In re Briana V.* (2015) 236 Cal.App.4th 297, 311 ["[T]here need not be a jurisdictional finding as to the particular parent upon whom the court imposes a dispositional order"]; *In re I.A.* (2011) 201 Cal.App.4th 1484, 1492 ["A jurisdictional finding involving the conduct of a particular parent is not necessary for the court to enter orders binding on that parent, once dependency jurisdiction has been established"]; *In re A.E.* (2008) 168 Cal.App.4th 1, 5 [recognizing juvenile court's discretion to order non-offending custodial parent to participate in counseling].)

The juvenile court has "wide latitude" in formulating dispositional orders to support the well-being of the minors.  (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.)  On appeal of a dispositional order, the juvenile court's determination as to what would "'best serve and protect the child's interests'" cannot be reversed

8

absent "a clear abuse of discretion." (*In re A.E.*, *supra*, 168 Cal.App.4th at p. 4.) However, as section 362 requires that the programs in which a parent is required to participate "be designed to eliminate" the conditions that led to the assertion of jurisdiction, there must be substantial evidence to support the court's implied conclusion that the non-offending parent's participation in the specified program is warranted to address the conduct that led the court to sustain the petition. (*In re Jasmin C.*, *supra*, 106 Cal.App.4th at p. 180; see *In re Drake M.* (2012) 211 Cal.App.4th 754, 770 [imposition of parenting classes "cannot be 'based on a rote assumption that [father] could not be an effective single parent without parenting classes'"]; *In re Sergio C.* (1999) 70 Cal.App.4th 957, 960 [dispositional order requiring father to submit to random drug tests reversed where only evidence of father's drug use was "unsworn and uncorroborated allegation"]; *In re Basilio T.* (1992) 4 Cal.App.4th 155, 172 [substance abuse component of reunification plan reversed where only evidence to support existence of substance abuse problem was mother's occasional odd behavior].) A reunification program cannot be imposed without findings or explanation merely because the agency feels the parent would benefit. (*In re Jasmin C.*, *supra*, at p. 181.) Requiring participation in unnecessary classes and programs would "'strain an intact family, let alone a broken one,'" and when the parent is newly in the position of caring for the children on his or her own "'adds a great deal of stress to an already tragic situation.'" (*Id*. at p. 182.)

Father challenges the dispositional order in part.[11] We find no evidence to support the portion of the dispositional plan imposed on Father requiring him to

---

[11] We reject respondent's contention that Father forfeited the right to contest the dispositional order by failing to object in the juvenile court. At the commencement of the hearing, Father asked the court to terminate jurisdiction. This was sufficient to make clear that Father objected to the issuance of any dispositional order requiring him to participate in services.

participate in a high-conflict parenting program and in individual counseling.[12]  At the time of the incident that precipitated DCFS's involvement, Father was fully employed and regularly visiting the children in accordance with the family law schedule.  The children, who were quick to describe to the caseworker the uncomfortable situation in Mother's home, reported no abuse by Father.  There was evidence of a past incident of domestic violence, but Father had participated in a 52-week program and resolved that situation years earlier.  There was no evidence of a recent recurrence.  In any event, as respondent acknowledges "the juvenile court did not premise the order for [F]ather's participate[on] in a high-conflict parenting course on the prior domestic violence incident."  Moreover, there was no evidence of any recent discord or conflict between Father and Mother.  The transcript of the divorce proceedings submitted at the dispositional hearing showed nothing unusual.  DCFS's August 2015 report stated that the parents "[did not] appear . . . [to] have the children's best interest at heart," and that they "play[ed] the blame game," but the only evidence cited was Mother's "fail[ure] to acknowledge that [Richard's] behavior toward the children affects the children's emotional health."  Indeed, according to the report, "[Father and Mother] stated that they get along and are civil with each other . . . ."

Respondent contends, as did the children's attorney below, that the children's "fragile emotional state" must be attributed in part to their parents' divorce, and suggests that Father's participation in a high-conflict parenting

---

[12]  Father specifically challenges that portion of the order requiring him to participate in a high-conflict parenting program.  He does not challenge the requirement that he participate in conjoint counseling with the children when appropriate.  Although neither party expressly addresses the portion of the order requiring Father to participate in individual counseling, we find such requirement sufficiently related to the issues raised on appeal to address it.

10

program will somehow alleviate that distress.[13]  The children, however, stated that their trauma derived primarily from the incident in which Richard threatened to shoot their Father in front of them, endangering all their lives, and from the way Richard treated them in Mother's home.  Mother theorized that their feelings about Richard derived from Father's speaking ill of him, but no evidence supported her theory, and Mother appeared to be in denial about the trauma Richard had inflicted on the children.  Respondent contends both parents "had a history of placing blame on one another," but cites only the August 2015 report, which made the same allegation without supporting evidence.  The only "blame" Father placed on Mother was in suggesting that she underestimated the threat of Richard's presence in the home -- a prediction that proved all too true.  Finally, respondent suggests that the order will cause Father to "be more motivated to get the children the therapeutic services they need."  No one, least of all Father, disputed that the children were in need of therapy to deal with the trauma of the April 2015 incident and, particularly in the case of Ri, the disparagement received from Richard in Mother's home.  Both children had been in monthly therapy prior to DCFS's intervention, and Father continued to take them throughout the proceedings.  Although he had not yet acted on the May 2015 recommendation that therapy be more frequent, there was no evidence this was due to conflict between the parents.  In short, there was no demonstrated need to require Father to undergo high-conflict parenting or individual therapy to ensure the children obtained their court-ordered therapy.

---

[13]     The children's attorney urged the court to ensure that the children  -- not Father -- were provided therapy and other services.

11

## DISPOSITION

The portion of the court's dispositional order requiring Father to participate in a high-conflict parenting program and individual counseling is reversed. In all other respects the dispositional order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


MANELLA, J.


We concur:


EPSTEIN, P. J.


WILLHITE, J.

12